## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| REEBOK INTERNATIONAL LTD., LLC, and REEBOK INTERNATIONAL LIMITED, | Case No. _____ |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| AUTRY INTERNATIONAL S.r.l and AUTRY USA, LLC | |
| Defendants. | |

Plaintiffs Reebok International Ltd., LLC and Reebok International Limited (collectively, "Reebok") through the undersigned counsel, bring this Complaint against Defendants Autry International, S.r.l and Autry USA, LLC (collectively, "Autry") and allege as follows:

## INTRODUCTION

1.     Since its beginning, Reebok's brand has been rooted in innovation and quality. From the 1895 founding of its related entity, J.W. Foster & Sons, which pioneered the spiked running shoe, to the launch of dozens of iconic footwear lines over multiple decades, to its continued innovation and production of high quality, high value footwear today, Reebok is—and has for decades been—a staple of the global footwear industry.

2.     The 1980s was a pivotal time period for the growth and fame of the Reebok brand— a time period that is remembered for the launch and popularization of some of Reebok's most timeless designs. These timeless designs and the intellectual property included therein have become synonymous with the 1980s, and the 1980s with them.

3.     Central to Reebok's brand identity, and these timeless designs, is Reebok's portfolio of unique, instantly recognizable trademarks, logos, and trade dresses that Reebok has

used to promote, advertise, sell, and offer to sell its highly sought-after footwear to consumers across the globe, including here in the United States.

4.      For example, among Reebok's valuable intellectual property is Reebok's iconic Window Box design mark, which as depicted immediately below and discussed further in this Complaint, consists of an elongated rectangular inset box that Reebok has consistently used as a source identifier in connection with upwards of 250 shoe lines in the United States since at least as early as 1981 (the "Window Box Mark"):



5.      Similarly, and equally prominent and significant, is Reebok's instantly recognizable Stripecheck design trademark, which as depicted immediately below and discussed further in this Complaint, consists of a stylized cross-check overlapping intersecting stripes, for which Reebok owns multiple incontestable federal trademark registrations, including but not limited to U.S. Trademark Reg. Nos. 1,196,293 and 1,831,392, and has consistently used as a source identifier in connection with upwards of 270 shoe lines in the United States for decades (the "Stripecheck Mark"):



6.     Likewise, and equally prominent and significant, is Reebok's instantly recognizable Crosscheck design trademark, which as depicted immediately below and discussed further in this Complaint, consists of Reebok's stylized cross-check that Reebok has consistently used as a source identifier in connection with upwards of 230 shoe lines in the United States since at least as early as 1970 (the "Crosscheck Mark"):



7.     With the Stripecheck Mark, Window Box Mark, and Crosscheck Mark adorning so many shoes for such a lengthy period of time, it comes as no surprise that Reebok has devoted significant time and resources over approximately forty to fifty years building and maintaining significant goodwill in, and consumer recognition of, these valuable marks.

8.     It also comes as no surprise that Reebok has not only generated billions of dollars in revenue in the United States alone from products bearing these Marks, but that it nevertheless tirelessly works to increase those revenue figures by, among other things, keeping these unique Marks top of mind and the products that bear them continuously sought after, even if the face of changing fashion trends and a competitive footwear market over the last four decades.

9.     Accordingly, the Stripecheck, Crosscheck, and Window Box Marks are among some of Reebok's most valuable intellectual property in which Reebok enjoys several decades worth of nationwide (and international) common law rights, in addition to those rights created by Reebok's multiple registrations for the Stripecheck Mark.

10.     As opposed to Reebok, Autry has not invested in competing in the market through innovation and original design.

11.     Instead, Autry has unabashedly positioned itself in the market by applying a single business strategy: to use without permission the well-known intellectual property of established footwear companies to sell high-priced knockoff sneakers to consumers in the United States.

12.     Autry's unlawful business strategy is readily apparent.  The Internet is replete with message boards and social media comments by consumers not just recognizing Autry's infringing activities, but in some cases expressing outrage at the same, as shown in the representative examples pictured below:





13.     Yet, one does not need to look at message boards or social media to see Autry's infringing conduct in action.  Autry's own website confirms that ***every single shoe*** Autry offers bears, without permission, Reebok's Window Box Mark in order to trade off consumer recognition and goodwill in that nearly forty-year-old trademark.

14.     Moreover, one of Autry's latest shoes to launch—the "*Open Mid*" Sneaker—takes Autry's infringement further by not just copying Reebok's exact Window Box Mark, but Reebok's iconic Crosscheck and Stripecheck Marks as well.

15.     Simple side-by-sides of Autry's shoes and a, non-exhaustive, sampling of Reebok shoes confirm these simple facts:



| **AUTRY'S INFRINGING SHOES** | **REEBOK SHOES** |
|:---:|:---:|
| *"Open Mid"* | *"EX-O-FIT Hi"* |



| | |
|---|---|
| *"Dallas Low"* | *"NPC II"* |
| *"Medalist Low"* | *"CLUB C 85"* |
| *"Super Vintage Low"* | |
| *"Bob Lutz"* | *"NPC UK II"* |

(Autry's shoes shown above, collectively with all color and other variations of these identified designs, are referred to herein as the "Infringing Shoes").

16.     As the chart above demonstrate, Autry's copying of Reebok's marks is not subtle or inadvertent; rather, Autry is aggressively marketing and selling its blatant knockoff versions of Reebok's shoes, infringing Reebok's trademark rights.

17.     Autry's actions of outright copying the Stripecheck, Crosscheck, and Window Box Marks with full knowledge of Reebok's decades-old rights and the tremendous value and goodwill embodied in the Stripecheck, Crosscheck, and Window Box Marks demonstrates its willful and intentional violation of Reebok's rights.

18.     Autry's perseverance in this conduct in the face of consumer comments evidencing Autry's unlawful actions, and in total disregard of Reebok's pre-suit requests that Autry cease infringing Reebok's decades-old rights, only underscores that conclusion.

19.     Reebok therefore has no choice but to file this lawsuit to stop and obtain redress for Autry's willful and intentional trademark infringement, unfair competition, false designation of origin, and false advertising in violation of the Lanham Act, 15 U.S.C. § 1051 *et seq.*; unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A; and common law trademark infringement and unfair competition.

## THE PARTIES

20.     Plaintiff Reebok International Ltd., LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 25 Drydock Avenue Boston, Massachusetts 02110. Plaintiff Reebok International Ltd., LLC is also the primary distributor of Reebok products in the United States.

21.     Plaintiff Reebok International Limited is a corporation organized under the laws of the United Kingdom with a place of business at 3rd Floor, 1 Ashley Road, Altrincham, Cheshire, United Kingdom.

22.     Upon information and belief, Defendant Autry International, S.r.l. is an Italian limited liability company.

23.     Upon information and belief, Defendant Autry International, S.r.l is the parent company of Autry's U.S.-based entity, Defendant Autry USA, LLC, which is a Delaware corporation with its principal place of business at 210 11th Avenue, Suite 603, New York, NY 10001.

24.     Together, Defendants Autry International S.r.l and Autry USA, LLC (as defined above, collectively "Autry") market, promote, sell, and offer to sell the Infringing Shoes in the United States through, among other channels, publicly accessible webpages hosted at <www.autry-usa.com>.

## JURISDICTION AND VENUE

25.     This is a civil action seeking actual damages, disgorgement of profits, injunctive relief, and/or corrective advertising under federal, Massachusetts, and common law based upon Autry's willful acts of trademark infringement, false designation of origin, unfair competition, and deceptive trade practices.

26.     This Court has original jurisdiction over this action pursuant to 15 U.S.C. § 1121(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1338(b).

27.     This Court has jurisdiction over the pendant state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims are based upon the same or substantially the same conduct by Autry.

28.     This Court has personal jurisdiction over Autry because Autry has engaged in substantial and regular business in the Commonwealth of Massachusetts and this District, including by importing, distributing, marketing, offering for sale, and selling its goods generally

as well as its Infringing Shoes specifically to consumers and/or entities located within Massachusetts.  Additionally, the Court has personal jurisdiction over Autry based on Autry's ownership, maintenance, and use of Autry's commercial webpages hosted at the domain name <www.autry-usa.com>, which Autry uses to not just solicit business from individuals and entities residing in Massachusetts but also to sell its goods—including the Infringing Shoes—to individuals and/or entities residing in Massachusetts. Autry's website also interacts with consumers in Massachusetts by, among other things, providing the opportunity to sign up for newsletters, and encourages individuals or entities to follow Autry on social media, which promote, advertise, and sell Autry's Infringing Shoes. Publicly available analytic tools, such as Google Trends, also confirm that Massachusetts is in the top three jurisdictions driving traffic to the Autry website. **Exhibit 1**.

29.     Upon information and belief, Autry is also aware that Reebok has a headquarters in Boston, Massachusetts as well as retail locations within the Commonwealth, meaning that the injury from Autry's unlawful conduct would be felt significantly within this District.

30.     Autry has therefore transacted business and/or caused tortious injury in this Commonwealth, which actions give rise to Reebok's claims.  Accordingly, the Court may exercise personal jurisdiction over Autry under at least Mass. Gen. Laws ch. 223A, § 3(a), (c), (d).

31.     As detailed above, Autry has further maintained purposeful minimum contacts with the Commonwealth of Massachusetts and this District related to Reebok's claims such that the exercise of personal jurisdiction over Autry in this action comports with the requirements of the Due Process Clause.

32.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims asserted in this Complaint occurred in this

District and because a substantial part of the property that is the subject of this Complaint is situated in this District.

33.     In the alternative, this Court has jurisdiction over Defendant under at least Federal Rule of Civil Procedure 4(k)(2) based on Defendant's aggregate contacts with the United States as a whole, which to the extent known are discussed more completely below.

## FACTUAL BACKGROUND

### I.    REEBOK AND ITS FAMOUS BUSINESS

34.     Reebok is an industry-leading shoe and apparel company, known for its original, high-quality, and distinctive footwear and apparel.

35.     Although a mainstay of American culture, Reebok traces its roots to the United Kingdom in 1895, when Joseph William Foster—the grandfather of Reebok's co-founders, Jeff and Joe Foster—started his running shoes company, J.W. Foster & Sons, from his bedroom above his father's workshop in Bolton, England.

36.     J.W. Foster's running shoes were some of the earliest to feature spikes on the sole and soon became popular among athletes, including Olympic champion Harold Abrahams, who wore the shoes to his 1924 gold medal victory in the 100-meter sprint.

37.     Inspired by the success of their grandfather's company, in 1958, Jeff and Joe Foster formed Reebok, naming the company after the grey rhebok antelope, a symbol of speed and agility.

38.     Over the ensuing decades, Reebok continued to grow in the United Kingdom and soon caught the eye of American businessman Paul Fireman, who in 1979 negotiated a deal to license and sell Reebok-branded goods in the United States under Reebok USA Ltd.  Mr. Fireman so believed in the Reebok brand that he actually launched three new shoes to market that same year.

39.     The 1980s were a decade of tremendous growth for the Reebok brand. Reebok's sales in the United States quickly took off, reaching more than $1.5 million in 1981, and $13 million by 1983—staggering amounts for the time.

40.     Building on the success of the Reebok brand in the United States, in 1984, Mr. Fireman acquired the Reebok-English parent company, moving the Reebok global headquarters to Massachusetts, where it has remained ever since.

41.     Today, due to the high demand for its shoes, Reebok sells its products through a variety of trade channels, including but not limited to Reebok's website; third-party e-commerce platforms; major fashion and streetwear brands such as SNS, SSENSE, End, and BAIT; department stores and retailers such as JD Sports, Nordstrom, Journeys, Tillys, Urban Outfitters, Rack City, and Famous Footwear; sporting goods and outdoor retailers such as Foot Locker and Dick's Sporting Goods; discount retailers such as DSW, TJ Maxx, and Ross; and Reebok's 59 retail stores throughout the United States.

42.     Consumers are therefore widely exposed to Reebok's products, and their associated trademarks and trade dresses, and have come to expect that they can purchase Reebok not only directly from the company itself but third parties as well.

43.     The company has also earned high praise both within and outside of the industry over the years.

44.     By way of example only, Reebok's parent company, Authentic Brands Group ("ABG"), recently won the prestigious "Company of the Year" award in 2021 from *Footwear News*, which hosts an annual ceremony often referred to as "The Shoe Oscars."  In giving ABG the award, *Footwear News* recognized that ABG's acquisition of Reebok was "the biggest win" for the company.

45.     Reebok itself has also been recognized as 2014 Digital Marketer of the Year by the Footwear Distributors and Retailers of America, and Reebok received six CLIO Sports awards in 2015 for achievements in marketing and innovation.

46.     Reebok's footwear has also been recognized for its cutting-edge innovations and exceptional quality.  For example, Reebok's FLOATRIDE RUN shoe received the 2017 "Best Debut" award from *Runner's World*, the FLOATRIDE RUN FAST won *Runner's World* "Gear of the Year" in 2018, the LEGACY LIFTER received a *Men's Health* 2019 Sneaker Award for innovation, the FLOATRIDE ENERGY won *Runner's World* "Gear of the Year" in 2019, and the CLASSIC LEATHER earned *Women's Health*'s Best White Sneaker Award in 2022.  Copies of the press releases and articles describing the above awards are attached as **Exhibit 2**.

## II.    REEBOK'S ICONIC TRADEMARKS

47.     As described above, from its humble beginnings, Reebok has grown into one of the most popular and well-known footwear companies in the United States today.

48.     Reebok's iconic trademarks—including but not limited to the Stripecheck, Crosscheck, and Window Box Marks at issue in this case—are a big part of that popularity, having been worn over the years by a wide variety of athletes and other celebrities, from tennis legends such as Boris Becker and John McEnroe, to basketball stars Shaquille O'Neal and Allen Iverson, to artists like Kendrick Lamar, Cardi B, Ariana Grande, and more.

49.     In an industry plagued by ever-changing fashion trends, Reebok has remained faithful to these core marks, using them consistently for decades and ensuring that they immediately convey to the public that the products being marketed, advertised, or sold in connection with those marks and trade dress carry with them Reebok's reputation for authenticity, quality, versatility, and excellence.

50.     Independent sources have routinely commented on the "legacy and longevity" of Reebok's shoes, deeming Reebok's designs "certified classics when it comes to style, with numerous looks remaining relevant to a modern audience."[1]

51.     Reebok's classic marks—including those at issue in this Complaint—have only grown in popularity and recognition in recent years due to the renewed focus of consumers on 1980s, retro-inspired fashion.[2]

## III.    REEBOK'S STRIPECHECK AND CROSSCHECK TRADEMARKS

52.     As discussed above, Reebok's Stripecheck and Crosscheck Marks are part of the company's core branding identity.

53.     In fact, since at least as early as the 1970s, Reebok has continuously used the Crosscheck and Stripecheck to promote, advertise, sell, and offer to sell its footwear and other apparel not just in the United States, but internationally as well.  Due to its brand recognition and substantial goodwill, Reebok has for four-plus decades used the Crosscheck and Stripecheck across multiple Reebok shoe lines and in countless color combinations.  Examples of this use are pictured immediately below, including but not limited to on Reebok's popular Classic Leather and Club C shoe models:



| Crosscheck Mark | Stripecheck Mark |
|---|---|
| Reebok CLASSIC LEATHER | Reebok CLASSIC LEATHER |

---

[1]     https://footwearnews.com/2021/shop/sneakers/classic-reebok-sneakers-1203214233/
[2]     https://www.whowhatwear.com/reebok-classics



Reebok CLUB C 85

Reebok CLUB C

Reebok NAO SERATI CLUB C

Reebok LEGACY LIFTER II

*"EX-O-FIT Hi"*

"Phase One Pro"

54.     In United States alone, Reebok has therefore sold hundreds of millions of shoes bearing the Stripecheck Mark, generating billions of dollars in revenue.  Similarly, in the United States alone, Reebok has sold hundreds of millions of shoes bearing the Crosscheck Mark, generating billions of dollars in revenue.

55.     In addition to capturing significant revenue and sales of products in tandem with the Crosscheck and Stripecheck Marks, Reebok has also devoted significant time and resources into promoting, fostering, and maintaining brand recognition of the marks among consumers in the United States.

56.     For example, Reebok has spent many millions of dollars advertising the Crosscheck and Stripecheck Marks in the United States, including in print publications, television and Internet advertising, signage, in-store displays, and social media, among other advertising mediums. Reebok's advertisements and marketing efforts have reached billions of individual consumers during that time.

57.     Reebok also promotes products bearing the Crosscheck and Stripecheck Marks by collaborating with celebrities.  As one example, Grammy-award-winning artist Cardi B has a partnership with Reebok and can often be seen wearing Reebok shoes with the Crosscheck and Stripecheck Marks.  Representative photographs of Cardi B wearing and promoting shoes with the Crosscheck and Stripecheck Marks are reproduced below:



58.     Simply put, there is no question that, as a result of Reebok's promotional and sales efforts over the past four-plus decades, the Crosscheck and Stripecheck Marks are one of the most recognizable, iconic, and valuable trademarks in the footwear industry.  Due to Reebok's efforts, consumers readily identify products bearing the Crosscheck and Stripecheck Marks as being high quality merchandise emanating from, sponsored by, or approved by Reebok.

59.     Reebok therefore has extensive, decades-old, nationwide common law rights in both the Crosscheck and Stripecheck Marks, and has enjoyed those rights long before Autry began engaging in the conduct discussed in this complaint.

60.     Reebok has also obtained multiple registrations for the Stripecheck Mark, including but not limited to registrations on the Principal Register of the U.S. Patent and Trademark Office ("USPTO").  For example, Reebok owns the following registrations for the Stripecheck Mark in connection with shoes and/or footwear in the United States:

| Trademark | U.S. Reg. No. | Reg. Date | Relevant Goods/Services |
|---|---|---|---|
|  | 1,196,293 | May 25, 1982 | *Class 25*: Shoes |
|  | 1,831,392 | April 19, 1994 | *Class 25*: Footwear |

61.     Each of these registrations is valid and subsisting on the Principal Register, and has been since their respective registration dates. The above registrations have also obtained incontestable status and are therefore conclusive evidence of the validity of the Stripecheck Mark, Reebok's ownership of the Stripecheck Mark, and Reebok's exclusive right to use the Stripecheck Mark in connection with footwear in the United States.  Copies of the Certificates of Registration and current TESS/TSDR information for the above marks are attached as **Exhibit 3** (Reg. No. 1,196,293) and **Exhibit 4 (**Reg. No. 1,831,392).

62.     In addition to the above registrations, Reebok has also adapted the Stripecheck Mark to promote Reebok's other apparel and products using the following "Vector Logo":



63.     Reebok owns additional U.S. Trademark Registrations for the Vector Logo, some of which are incontestable, including but not limited to U.S. Reg. No. 6,694,415 (issued April 5, 2022), No. 2,309,329 (issued January 18, 2000), and No. 2,309,105 (issued January 18, 2000). Copies of the Certificates of Registration and TESS/TSDR information for each of these marks are attached collectively as **Exhibit 5**.

64.     As a result of Reebok's efforts, the public recognizes and understands that the Crosscheck Mark, Stripecheck Mark, and related Vector Logo distinguish and identify Reebok's products.  As just an example, third-party publications and media reports have referred to Reebok's Vector Logo, which is based on the Stripecheck Mark, as an "iconic mark," and the "legendary vector logo." *See* **Exhibit 6**.

65.     Accordingly, thanks to Reebok's dedication to providing high quality, original, and authentic footwear and apparel using the Crosscheck Mark, Stripecheck Mark, and related Vector Logo, as well its extensive marketing and years of hard work, Reebok has built up and now owns significant and valuable goodwill that is symbolized by the Crosscheck and Stripecheck Marks. Consumers recognize the Crosscheck and Stripecheck Marks as source identifiers that are uniquely associated with Reebok and genuine Reebok brand products.

## IV.    THE WINDOW BOX MARK

66.    Along with the Stripecheck and Crosscheck Marks, the Window Box Mark has become synonymous with Reebok and its high-value products.

67.    In fact, since at least as early as the 1980s, Reebok has continuously used the Window Box Mark to promote, advertise, sell, and offer to sell its footwear not just in the United States, but internationally as well.

68.    Reebok first launched the iconic Window Box Mark without including the REEBOK brand inside the inset.  Since that point, and as discussed further below, Reebok has used the Window Box Mark both with and without the REEBOK brand inside the inset.

69.    Due to its brand recognition and substantial goodwill, Reebok has for four-plus decades used the Window Box Mark across multiple shoe lines and in countless color combinations.  Examples of this use are pictured immediately below, including but not limited to on Reebok's popular Classic Leather and Club C shoe models:



*Reebok CLASSIC LEATHER*                    Reebok CLUB C



|  |  |
|---|---|
| Reebok WORKOUT PLUS | Reebok PRINCESS |
| Reebok FREESTYLE HI Toddler | Reebok Cardi B FREESTYLE HI |

70.    In the United States alone, Reebok has therefore sold half a billion shoes bearing the Window Box Mark, generating billions of dollars in revenue.

71.    In addition to capturing significant revenue and sales of products in tandem with the Window Box Mark, Reebok has also devoted significant time and resources into promoting, fostering, and maintaining brand recognition of the mark among consumers in the United States.

72.    For example, Reebok has spent many millions of dollars advertising the Window Box Mark in the United States, including in print publications, television and Internet advertising, signage, in-store displays, and social media, among other advertising mediums. Reebok's

advertisements and marketing efforts have reached billions of individual consumers during that time.

73.     Reebok also promotes products bearing the Window Box Mark by collaborating with celebrities.  As just one example, Reebok has partnered with Ariana Grande, and she has been frequently seen in shoes bearing the Window Box Mark, as shown below.



74.     Reebok's partner, Cardi B, has also promoted shoes prominently bearing the Window Box Mark, as shown in the below representative image.



75.     Although the Window Box Mark is often used in conjunction with the word mark REEBOK and an image of the Union Jack flag (the "REEBOK Union Jack Mark"), Reebok has used the Window Box Mark both with and without the REEBOK Union Jack Mark and with no insert at all, as shown in the below examples:





*Reebok Jurassic World Club C*                    *Reebok POPSICLE WORKOUT PLUS*

76.     Reebok has also used the Window Box Mark to highlight the other brands and companies with whom it has collaborated.  For example, streetwear brand LQQK Studio has collaborated with Reebok on the below CLASSIC LEATHER design that prominently displays the LQQK brand in the Window Box Mark:



77.     Simply put, there is no question that, as a result of Reebok's promotional and sales efforts over the past four-plus decades, the Window Box Mark was and is a highly recognized, valuable mark that belongs exclusively to Reebok.  Due to Reebok's efforts, consumers readily identify products bearing the Window Box Mark as being high quality merchandise emanating from, sponsored by, or approved by Reebok.

78.     As a result of Reebok's efforts, the public recognizes and understands that the Window Box Mark distinguishes and identifies Reebok's products.

79.     Accordingly, thanks to Reebok's dedication to providing high quality, original, and authentic footwear and apparel using the Window Box Mark, as well its extensive marketing and years of hard work, Reebok has built up and now owns significant and valuable goodwill that is symbolized by the Window Box Mark.  Consumers recognize the Window Box Mark as a source identifier that is uniquely associated with Reebok and genuine Reebok brand products.

80.     Reebok therefore has extensive, decades-old, nationwide common law rights in the Window Box Mark, and has enjoyed those rights long before Autry began engaging in the conduct discussed in this complaint.

## V.      REEBOK'S REPUTATION FOR QUALITY AND THE GOODWILL EMBODIED IN ITS TRADEMARKS

81.     Reebok maintains strict quality control standards for its footwear. Reebok goes to great lengths to ensure that its genuine Reebok products are designed for durability, performance, and comfort, and that they are inspected and approved by Reebok prior to distribution and sale.

82.     These efforts include performing testing of all shoes during and after the design and manufacturing process to ensure that they meet Reebok's standards for quality, durability, and value for money.

83.     Reebok submits both the materials used in its shoes and the shoes themselves to a battery of tests, including aging tests, bonding tests, seam tests, rain tests, flex tests, slip tests, sun tests, and many others.

84.     Reebok consistently polices and confirms the quality of the shoes being produced by its manufacturing partners.

85.     Due to these efforts by Reebok, consumers and potential purchasers have come to expect high quality goods from Reebok and such trust is reinforced when they see high quality Reebok shoes in public.

86.     Reebok not only strictly monitors the quality of the products that it sells, but also carefully determines where the products are released, when the products are released, and how the products are released by, among other things, introducing new collaborations, colorways, and designs in rotating cycles, thereby avoiding market saturation.

87.     Reebok also carefully selects the fashion brands, designers, celebrities, and influencers with whom it collaborates to reach specific consumers and deliver a message that is consistent with the Reebok brand.

88.     Reebok has painstakingly developed over many decades a brand strategy that appeals to both consumers intent on making a statement and consumers focused on classic, clean designs, bridging the gap between generations and taste preferences.

## VI.   AUTRY'S UNLAWFUL USE OF REEBOK'S INTELLECTUAL PROPERTY

89.     In contrast to Reebok, Autry tries to skip the significant investments required to develop original, authentic, and high-quality shoes, and instead is attempting to free-ride off Reebok's reputation and popularity, all while deceiving its customers and infringing Reebok's protected trademarks.

90.     Autry has done, and continues to do so by developing, advertising, promoting, offering to sell, and selling shoes that all bear Reebok's exact Window Box Mark, as depicted above and again immediately below:



| AUTRY'S SHOES INFRINGING REEBOK'S ASSERTED WINDOWBOX MARK | REEBOK SHOES (NON-EXHAUSTIVE SAMPLING) |
|---|---|
| "*MEDALIST LOW*" | "*LT COURT*"   "*CLASSIC LEATHER*" |
| "*DALLAS LOW*" | "*CLUB C DOUBLE*"   "*FREESTYLE HI*" |
| "*SUPER VINTAGE*" | "*LX2200*"   "*PRINCESS WIDE*" |
| "*BOB LUTZ*" | "*WORKOUT PLUS*"   "*VEEFRIENDS CLASSIC*" |

91.     Autry has likewise escalated its infringement of Reebok's rights through the introduction of its "Open Mid" shoe, which uses not only an identical Window Box Mark but also a mark that is identical and/or virtually identical to Reebok's Crosscheck and Stripecheck Marks, as shown above and again immediately below:



| AUTRY'S "*OPEN MID*" SHOE INFRINGING <u>BOTH</u> REEBOK'S CROSSCHECK AND WINDOWBOX MARKS | REEBOK SHOES FEATURING BOTH CROSSCHECK AND WINDOWBOX MARKS (NON-EXHAUSTIVE SAMPLING) |
|---|---|
|  | "*CLUB C 85*" |
|  | "*CLASSIC LEATHER*" |
|  | "*EX-O-FIT HI*" |



"*EX-O-FIT HI*" (CLOSE-UP)

92.     In fact, conclusive of Autry's blatant copying is that all of Autry's knock-off shoes simply remove the REEBOK Union Jack mark that is often (but not always) inside the Window Box Mark on Reebok shoes, and include in its place a confusingly similar, red, white, and blue, United States flag:



93.     Autry's inclusion of the AUTRY FLAG LOGO inside the Window Box Mark therefore does nothing to alleviate the likelihood of confusion.

94.     In fact, Autry's use of the United States flag in their AUTRY FLAG LOGO is wholly misleading as Autry International S.r.l is a foreign (Italian)-based entity that, on information and belief, manufactures its shoes in Asia. The AUTRY FLAG LOGO, and Autry's additional usage of United States flag designs on packaging, attempts to mislead consumers into believing that the shoes they are purchasing are made in the United States, when in fact that notion is materially false. A representative sampling of Autry's misleading usage of the AUTRY FLAG LOGO and United States flag imagery is reproduced below:







95.    Moreover, as noted above, Reebok sometimes partners with other companies to allow those companies to use the Window Box Mark in connection with those companies' brands. Examples of this include:



Partnership with "Global Citizen" Brand

Partnership with "LQQK" Brand

Partnership with "Biosyn Genetics Lab" Brand

Partnership with "Pleasures" Brand

Partnership with "Maharishi" Brand

96.    Autry's use of the Window Box Mark with its own branding therefore further suggests a partnership or affiliation with Reebok, when none exists.

## VII.   ADDITIONAL ACTIONS BY AUTRY TO CREATE CONFUSION

97.    In addition to infringing Reebok's Marks, Autry takes additional steps to create and perpetuate confusion between the Infringing Shoes and its business, on the one hand, and Reebok and its brands, on the other hand.

98.    For example, Autry perpetuates the substantial likelihood of confusion that its use of the Window Box, Crosscheck, and Stripecheck Marks creates by using a variety of other design elements on its shoes that are calculated to make them confusingly similar to shoes offered by Reebok, such as nearly identical heel tabs, toe caps, tapered midsoles, and heel stitching.

99.    Indeed, most, if not all, of Autry's Infringing Shoes are mere amalgamations of various design elements included in Rebook's wildly popular shoes.

100.    Similarly, Autry fosters consumer confusion by intentionally promoting and marketing its shoes as "vintage"-inspired and evocative of the 1980s, the decade in which Reebok released three of its shoes bearing the Stripecheck, Crosscheck, and Window Box Marks, i.e., the Club C, the Classic Leather, and the Workout Plus—shoes that became mainstream, iconic, and synonymous in the minds of consumers with the decade in which they were launched. Examples of this type of advertising by Autry is picture immediately below:



## VIII.  AUTRY SELLS IDENTICAL PRODUCTS TO THE SAME OR SIMILAR CUSTOMERS IN THE SAME OR SIMILAR CHANNELS OF TRADE

101.    Hoping to capitalize on the confusion its actions are sowing, Autry then intentionally and deliberately targets the same and/or similar consumers and prospective consumers as Reebok by selling the Infringing Shoes in direct competition with Reebok through the same and/or similar channels of trade.

102.    By way of example, both Reebok and Autry shoes are available for purchase at fashion retailers such as Nordstrom, Neiman Marcus, ModeSens, Saks Fifth Avenue, and Farfetch.

103.    By copying Reebok's iconic Stripecheck, Crosscheck, and Window Box Marks, Autry therefore guarantees that consumers encountering the Infringing Shoes either at point of sale or in the post-sale context are substantially likely to be confused, mistaken, and/or deceived as to the source, sponsorship, affiliation, and/or other relationship between Reebok and its products, on the one hand, and Autry and its Infringing Shoes, on the other hand.

## IX.    INJURIES TO REEBOK AND THE PUBLIC

104.    Together with its blatant copying of Reebok's trademark rights, the above actions by Autry demonstrate its willful disregard for Reebok's intellectual property and its intentional and deliberate attempts to capitalize on the goodwill that Reebok has built in its protected trademarks over decades for its own financial gain.

105.    The scope of Autry's existing infringement cannot be overstated.

106.    Without permission, authorization, or consent from Reebok, Autry has infringed Reebok's trademark rights by developing, advertising, promoting, selling, and/or offering to sell the Infringing Shoes, which all bear marks that are confusingly similar to Reebok's trademarks.

107.    Autry has aggressively marketed the Infringing Shoes that plainly incorporate Reebok's protected trademarks.

108.    Autry has not only maintained a website (<www.autry-usa.com>) that advertises and sells the Infringing Shoes to consumers, but, upon information and belief, has also purchased advertisements targeted directly at the social media accounts and websites visited by consumers and potential consumers of Reebok's shoes.

109.    Autry began promoting, advertising, offering to sell, and selling the Infringing Shoes long after Reebok acquired the trademark rights asserted herein, and long after Reebok established itself as one of the most popular footwear companies in the world.

110.    Autry engaged in this conduct with full knowledge of Reebok's rights, and in a knowing and willful effort to violate those rights.

111.    The Infringing Shoes produced, distributed, marketed, promoted, offered for sale, and sold by Autry are not made by Reebok.  Nor are Autry's products associated, affiliated, or connected with Reebok, or licensed, authorized, sponsored, endorsed, or approved by Reebok in any way.

112.    The likelihood of confusion, mistake, and deception engendered by Autry's infringement of Reebok's trademarks is causing irreparable harm to the goodwill symbolized by the marks and the reputation for originality, authenticity, and quality that they embody.

113.    As noted above, Autry's activities are likely to cause confusion before, during, and after the time of purchase because consumer, prospective purchasers, and others viewing Autry's Infringing Shoes at the point of sale or post-purchase are likely—due to Autry's intentional use of confusingly similar imitations of Reebok's trademarks—to mistakenly attribute the Infringing Shoes to Reebok.

114.    By causing a likelihood of confusion, mistake, and deception, Autry is inflicting irreparable harm on Reebok and damaging its reputation.

115.   Indeed, consumers and social media users have already either been confused by and/or recognized the confusing similarity between Autry's Infringing Shoes and Reebok's asserted trademarks.  *See* **Exhibit 7.**

116.   The false association with Reebok created by Autry's willful infringement also threatens to harm, and has in fact harmed, Reebok's reputation for high quality collaborations. Reebok carefully selects its collaboration partners to maintain its brand image and to reach specific audiences.  Accordingly, Reebok ensures that its partners embody the same values conveyed by its trademarks.

117.   Autry does not meet the same high standards that Reebok looks for in a collaboration partner. As just one example, Autry's consumer ratings have been consistently low, including 1- and 2-star ratings out of 5 stars on consumer rating website Trustpilot. *See* **Exhibit 8**. Consumer feedback on Autry's social media posts has also been largely critical of the company and the quality of its shoes, as illustrated by the below non-limiting examples.





118.   As reflected by the above consumer ratings and feedback, Autry receives complaints regarding the physical quality of Autry's Infringing Shoes.

119.   Any defects, or quality issues, relating to Autry's Infringing Shoes are likely to negatively impact Reebok's reputation as a result of a mistaken impression that the Infringing Shoes emanate from, or are affiliated, with Reebok.

120.   Upon information and belief, the workmanship on the Autry Infringing Shoes is below Reebok's quality standards.

121.   Autry's sale of the Infringing Shoes therefore threatens to harm, and in fact harms, Reebok's reputation for producing high quality, high value shoes by misleading consumers into believing that Reebok is the source and/or sponsor of Autry's lower quality, lower value copycats of Reebok's classic designs.

122.   Additionally, Autry's conduct irreparably harms Reebok's ability to control when its products are released, how they are released, and in what quantity they are released.  As noted above, Reebok intentionally manages its shoe releases on a cyclical schedule that builds demand for its products and ensures the market is not saturated with too many iterations and colorways. By releasing the Infringing Shoes, Autry undermines and irreparably harms Reebok's ability to

manage the release of its shoes, flooding the market with lower quality, confusingly similar knockoffs.

123.    The irreparable harm from Autry's saturation of the market with Autry's Infringing Shoes is ongoing.

## COUNT I
### Federal Trademark Infringement (15 U.S.C. § 1114)

124.    Reebok repeats and incorporates by reference the allegations in the preceding paragraphs 1-123.

125.    Reebok's Stripecheck Mark is a valid, protectible, federally registered incontestable mark that belongs to Reebok.

126.    Autry has knowingly used and continues to use in commerce, without Reebok's permission or authorization, Reebok's Stripecheck Mark, and/or confusingly similar marks, in connection with products that Autry designs, manufactures, imports, distributes, promotes, advertises, offers for sale, and/or sells in the United States, namely the Infringing Shoes.

127.    Autry's use of Reebok's Stripecheck Mark has caused and is likely to cause confusion, deception, and mistake by creating the false and misleading impression that Autry's goods are produced or distributed by Reebok, or are associated or connected with Reebok, or have the sponsorship, endorsement, or approval of Reebok.

128.    Autry's Infringing Shoes are confusingly similar to Reebok's federally registered marks in violation of 15 U.S.C. § 1114.  Autry's activities are causing and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the trade and public, and, additionally, injury to Reebok's goodwill and reputation as embodied in the Reebok's marks, for which Reebok has no adequate remedy at law.

129.    Autry's actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Reebok's Stripecheck Mark to Reebok's great and irreparable harm.

130.    Autry caused and is likely to continue causing substantial injury to the public and to Reebok, and Reebok is entitled to injunctive relief and to recover Autry's profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1114, 1116, and 1117

### COUNT II
### Federal Trademark Infringement and Unfair Competition (15 U.S.C. § 1125(a)(1)(A))

131.    Reebok repeats and incorporates by reference the allegations in the preceding paragraphs 1-123.

132.    Reebok's Stripecheck, Crosscheck, and Window Box Marks are inherently distinctive identifiers of source that consumers identify with Reebok, and each has enjoyed significant recognition by the consuming public as a source identifier of Reebok long before Autry's actions addressed by the Complaint began.

133.    Based on extensive marketing, promotion, and use, Reebok's Stripecheck, Crosscheck, and Window Box Marks also enjoy significant secondary meaning among consumers, instantly identifying Reebok as the source of the products with which they are used.

134.    Autry has knowingly used and continues to use in commerce, without Reebok's permission or authorization, Reebok's Stripecheck, Crosscheck, and Window Box Marks, and/or confusingly similar marks, in connection with products that Autry designs, manufactures, imports, distributes, promotes, advertises, offers for sale, and/or sells in the United States, namely the Infringing Shoes.

135.    Autry's use of the Stripecheck, Crosscheck, and Window Box Marks has caused and is likely to cause confusion, deception, and mistake by creating the false and misleading

impression that Autry's goods are produced or distributed by Reebok, or are affiliated, connected, or associated with Reebok, or have the sponsorship, endorsement, or approval of Reebok.

136.     Autry has made false representations, false descriptions, and false designations of, on, or in connection with its goods in violation of 15 U.S.C. § 1125(a). Autry's activities have caused and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the trade and public, and, additionally, injury to Reebok's goodwill and reputation as embodied in the marks, for which Reebok has no adequate remedy at law.

137.     Autry's actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with the Stripecheck, Crosscheck, and Window Box Marks to the great and irreparable injury of Reebok.

138.     Autry's conduct has caused, and is likely to continue causing, substantial injury to the public and to Reebok. Reebok is entitled to injunctive relief and to recover Autry's profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1125(a), 1116, and 1117.

## **COUNT III**
**Federal Unfair Competition and False Advertising (15 U.S.C. §§ 1125(a)(1)(A)-(a)(1)(B))**

139.     Reebok repeats and incorporates by reference the allegations in the preceding paragraphs 1-123.

140.     Upon information and belief, Autry has made false and/or misleading representations of fact in its promotional and advertising materials, including the advertising and promotions on its website, regarding the geographic origin of its goods.  Specifically, Autry's use of the AUTRY FLAG LOGO and other United States flag imagery on its shoes and packaging has deceived and misled the public by misrepresenting that its shoes are made in or originate in the United States, when they do not.

141.    Instead, upon information and belief, Autry's shoes, including the Infringing Shoes, originate from and are made in countries other than the United States. Upon information and belief, Autry shoes have no connection with the United States beyond their sale in interstate commerce.

142.    Autry's use of the Autry Flag Logo and other United States flag imagery on its packaging is likely to cause confusion, or to cause mistake, or to deceive as to the origin of Autry's shoes.

143.    Autry's false and misleading representations have deceived and/or are likely to deceive consumers in a material way, in that consumers are likely to rely on Autry's misrepresentations regarding the origin of its shoes in deciding whether to buy Autry's products.

144.    Autry's false and misleading representations of material fact have caused, and are likely to continue causing, substantial injury to the public and to Reebok, including by harming and undermining Reebok's competitive position. Reebok is entitled to injunctive relief and to recover Autry's profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1125(a), 1116, and 1117.

### <u>COUNT IV</u>
**Massachusetts Deceptive and Unfair Trade Practices (Mass. Gen. Laws ch. 93A)**

145.    Reebok repeats and incorporates by reference the allegations in the preceding paragraphs 1-123.

146.    Autry's intentional and knowing use of the Stripecheck, Crosscheck, and Window Box Marks in the United States in connection with the Infringing Shoes, and its statements regarding the nature, characteristics, qualities, and/or geographic origin of those shoes, including but not limited through its use of the AUTRY FLAG LOGO and other United States flag imagery, are unfair trade practices and materially deceptive.

147.    Autry's use of the Reebok trademarks and false and misleading statements are made in connection with the advertising, offer for sale, and sale of products and is directed primarily and substantially within Massachusetts, including because Reebok is headquartered in Massachusetts; Autry distributes the Infringing Shoes and other products sold in connection with its deceptive advertising in Massachusetts; and Autry directs its advertising at customers and prospective customers in Massachusetts, in addition to the entire United States.

148.    These commercial advertisements and statements have and will continue to cause the loss of goodwill and the loss of current and prospective customers of Reebok who, but for the false and misleading advertisements and statements made by Autry, would conduct business with Reebok or its authorized licensees.

149.    Reebok has been and will continue to be irreparably harmed unless Autry's use of the Stripecheck, Crosscheck, and Window Box Marks as well as the AUTRY FLAG LOGO in the United States in connection with the Infringing Shoes is enjoined.

150.    Autry's deceptive and unfair trade practices justify an increase in damages up to three times the amount awarded in compensatory damages, plus reasonable attorneys' fees, as permitted under Chapter 93A.

**<u>COUNT V</u>**
**Common Law Trademark Infringement and Unfair Competition**

151.    Reebok repeats and incorporates by reference the allegations in the preceding paragraphs 1-123.

152.    Reebok is the owner of all rights and title to, and has valid and protectable prior rights in, the Stripecheck, Crosscheck, and Window Box Marks.

153.    Reebok engages in the sale and distribution of footwear employing the Stripecheck, Crosscheck, and Window Box Marks in the Commonwealth of Massachusetts and has done so since long before Autry began its infringing use, as alleged herein.

154.    The Stripecheck, Crosscheck, and Window Box Marks are inherently distinct and enjoy secondary meaning among consumers based on extensive marketing, promotion, and use, instantly identifying Reebok as the source of the products with which they are used.

155.    Autry has reproduced, copied, and imitated the Stripecheck, Crosscheck, and Window Box Marks in connection with developing, advertising, promoting, offering to sell, and/or selling footwear, in competition with Reebok and without Reebok's consent.

156.    Autry's use of confusingly similar imitations of the Stripecheck, Crosscheck, and Window Box Marks has caused and is likely to cause confusion, deception, and mistake by creating the false and misleading impression that Autry's goods are produced or distributed by Reebok, or are affiliated, connected, or associated with Reebok, or have the sponsorship, endorsement, or approval of Reebok.

157.    Autry's acts of common law trademark infringement and unfair competition have been willful and deliberate and committed in bad faith, and Autry has and will continue to profit and be unjustly enriched by sales that Autry would not otherwise have made but for its unlawful conduct.

158.    Autry's willful and deliberate acts described herein have caused injury and damage to Reebok, and have caused irreparable injury to Reebok's goodwill and reputation and, unless enjoined, will cause further irreparable injury, whereby Reebok has no adequate remedy at law. Reebok is therefore entitled to injunctive relief.

159.    Reebok is also entitled to its actual damages, Autry's profits, and an award of costs and attorneys' fees.

## PRAYER FOR RELIEF

Reebok respectfully requests that the Court enter judgment in its favor and against Autry as follows:

1.    Autry and all of its agents, officers, employees, representatives, successors, assigns, attorneys, and all other persons acting for, with, by, through or under authority from Autry, or in concert or participation with Autry, and each of them be preliminarily and permanently enjoined from:

a.    advertising, marketing, promoting, offering for sale, distributing, or selling the Infringing Shoes;

b.    using Autry's infringing imitation of the Stripecheck, Crosscheck, and/or Window Box Marks, or any mark confusingly similar thereto, on or in connection with any of Autry's goods or services;

c.    using Reebok's Stripecheck, Crosscheck, and/or Window Box Marks, or any of Reebok's registered or common law trademarks, or any other copy, reproduction, colorable imitation, or simulation of Reebok's marks on or in connection with Autry's goods or services;

d.    using any trademark, name, logo, design, or source designation of any kind on or in connection with Autry's goods or services that is a copy, reproduction, colorable imitation, or simulation of, or confusingly similar to any of Reebok's trademarks, trade dresses, names, or logos;

e.   using any trademark, name, logo, design, or source designation of any kind on or in connection with Autry's goods or services that is likely to cause confusion, mistake, deception, or public misunderstanding that such goods or services are produced or provided by Reebok, or are sponsored or authorized by Reebok, or are in any way connected or related to Reebok;

f.   passing off, palming off, or assisting in passing off or palming off Autry's goods as those of Reebok, or otherwise continuing any and all acts of unfair competition as alleged in this Complaint; and

g.   engaging in any actions, including but not limited to use of the AUTRY FLAG LOGO, that mislead or deceive consumers into believing that Autry is an American company and/or that its products are made in the United States.

2.   Autry be ordered to cease offering for sale, marketing, promoting, and selling and to recall all infringing footwear, or any other goods bearing Autry's confusingly similar imitation marks that are in Autry's possession or have been shipped by Autry or under its authority, to any store, affiliate, subsidiary, business, wholesaler, distributor, retailer, or marketer, and also to deliver to each such entity a copy of this Court's order as it relates to said injunctive relief against Autry;

3.   Autry be ordered to deliver up for impoundment and for destruction, all infringing footwear, bags, boxes, labels, tags, signs, packages, receptacles, advertising, sample books, promotional materials, stationery, or other materials in the possession, custody or under the control of Autry that are found to adopt, infringe,

or misappropriate Reebok's trademarks or that otherwise unfairly compete with Reebok and its products;

4.  Autry be compelled to account to Reebok for any and all profits derived by Autry from the sale or distribution of the infringing footwear;

5.  Autry be compelled to account for any and all profits derived by Autry from the sale or distribution of other products while using Reebok's trademarks, and/or confusingly similar marks, to advertise such products;

6.  Reebok be awarded all damages, including all actual damages, caused by the acts forming the basis of this Complaint;

7.  Based on Autry's knowing and intentional use of a confusingly similar imitation of Reebok's trademarks, the damages awarded be trebled and the award of Autry's profits be enhanced as provided for by 15 U.S.C. § 1117(a);

8.  Autry be required to pay to Reebok the costs, expenses, and reasonable attorneys' fees incurred by Reebok in this action pursuant to 15 U.S.C. § 1117(a) and Massachusetts law;

9.  Based on Autry's willful and deliberate infringement of Reebok's trademarks, and to deter such conduct in the future, Reebok be awarded punitive damages;

10. Reebok be awarded treble damages, punitive damages, and attorneys' fees for Autry's unfair and deceptive trade practices under Mass. Gen. Laws ch. 93A.

11. Reebok be awarded restitution for Autry's unjust enrichment;

12. Reebok be awarded prejudgment and post-judgment interest on all monetary awards; and

13.     Reebok be granted such other and further relief in its favor as the Court may deem

just.


### JURY DEMAND

Reebok hereby demands a trial by jury on all claims and issues so triable.


Dated:  May 2, 2023                          Respectfully submitted,

                                             **MCGUIREWOODS LLP**

                                             */s/ John J. Tumilty*_____
                                             John J. Tumilty (BBO# 560017)
                                             Paige K. Zacharakis (BBO# 699108)
                                             **Morse, Barnes-Brown & Pendleton, P.C.**
                                             480 Totten Pond Road, 4th Floor
                                             781-622-5930
                                             781-622-5933 (fax)
                                             jtumilty@morse.law
                                             pzacharakis@morse.law

                                             Lucy J. Wheatley (*pending pro hac vice*)
                                             Amanda L. DeFord (*pending pro hac vice*)
                                             Matthew R. Rosendahl (*pending pro hac vice*)
                                             800 East Canal Street
                                             Richmond, VA 23219
                                             Tel: (804) 775-1000
                                             Fax: (804) 698-2016
                                             lwheatley@mcguirewoods.com
                                             adeford@mcguirewoods.com
                                             mrosendahl@mcguirewoods.com

                                             Luigi Aletto (*pending pro hac vice*)
                                             1750 Tysons Boulevard, Suite 1800
                                             Tysons, VA 22102
                                             Tel: (703) 712-5000
                                             Fax: (703) 712-5050

                                             *Counsel for Plaintiff Reebok International
                                             Ltd., LLC and Reebok International Limited*